**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Cleveland Yarrow Cook, | No.  CV 17-02569-PHX-DGC (JFM) |
| Plaintiff, | |
| vs. | **ORDER** |
| Crystal Lee, et al., | |
| Defendants. | |

Plaintiff Cleveland Yarrow Cook, who is confined in the Arizona State Prison Complex (ASPC)-Lewis, Rast Unit, brought this pro se civil rights action under 42 U.S.C. § 1983 against five Arizona Department of Corrections (ADC) employees—Deputy Warden Crystal Lee, Chief of Security Captain Randy Kaufman, Programs Director Wayne Metzler, Programs Facilitator Robert Charette, and Shift Supervisor Heather Pontious (ADC Defendants)—and three Corizon employees—Dr. Itoro Elijah, Dr. Murray Young, and Nurse Practitioner (NP) Lawrence Ende (Corizon Defendants).  (Doc. 1.)  Before the Court are two separate Motions for Summary Judgment, one filed by ADC Defendants and one filed by Corizon Defendants.  (Docs. 64, 66.)  The Court will deny ADC Defendants' Motion and grant Corizon Defendants' Motion.

**I.    Background**

Plaintiff's claims arose during his confinement at the ASPC-Lewis, Buckeye Unit. (Doc. 1 at 1.)  In Count One of his Complaint, Plaintiff alleged that ADC Defendants failed to protect him from an attack by another prisoner.  (*Id.* at 5.)  Plaintiff averred that he

immediately informed Pontious and Charette of numerous threats of harm and death threats from this other prisoner. (*Id.*) Plaintiff alleged that Kaufman and Metzler were notified of the threats to Plaintiff's safety via emails, incident reports, and numerous inmate letters. (*Id.*) According to Plaintiff, ADC Defendants were deliberately indifferent to the risk of harm to Plaintiff's safety posed by the other prisoner and took no action. (*Id.* at 5–6, 8.) Thereafter, during an escort to recreation, the other prisoner slipped out of his cuffs and assaulted Plaintiff. (*Id.* at 6–7.)

In Count Two, Plaintiff alleged that Corizon Defendants failed to provide adequate medical treatment after the attack. (*Id.* at 10.) Plaintiff stated that he suffered two lacerations to his right ear, which caused his ear to split into three pieces, and that he suffered queasiness, dizziness, and a constant ringing in his ear. (*Id.* at 10.) Plaintiff alleged that Corizon Defendants refused to take Plaintiff to the emergency room for treatment or stitches. (*Id.* at 10–12.) The next morning, Dr. Elijah put 13 stitches in Plaintiff's ear, but she failed to address Plaintiff's dizziness, vomiting, and the ringing in his ear. (*Id.* at 11.) Plaintiff was seen in medical six days after the attack, at which time a nurse conducted a concussion protocol for the first time. (*Id.*)

Upon screening, the Court determined that Plaintiff sufficiently stated an Eighth Amendment failure-to-protect claim in Count One and an Eighth Amendment medical care claim in Count Two. (Doc. 7.)

ADC Defendants move for summary judgment as to Count One on the grounds that Pontious did not perceive a risk of harm to Plaintiff; Charette acted reasonably to the risk of harm; Lee, Metzler, and Kaufman had no knowledge of the threats against Plaintiff; and Pontious and Charette are entitled to qualified immunity. (Doc. 66.)

Corizon Defendants move for summary judgment as to Count Two on the grounds that Plaintiff did not have a serious medical need, there is no evidence Corizon Defendants

acted with deliberate indifference, and Plaintiff cannot show any harm or injury as a result of Corizon Defendants' conduct. (Doc. 64.)[1]

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson*, 477 U.S. at 250; *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); see Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court does not make credibility determinations; it must

---

[1] The Court issued an Order with the Notice required under *Rand v. Rowland*, 154 F.3d 952, 960 (9th Cir. 1998) (en banc), which informed Plaintiff of the summary judgment requirements under Federal Rule of Civil Procedure 56. (Doc. 71.)

believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3). Further, where the nonmovant is pro se, the court must consider as evidence in opposition to summary judgment all of the pro se litigant's contentions that are based on personal knowledge and that are set forth in verified pleadings and motions. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004); *see Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995).

## III. Count One—Failure to Protect

### A. Procedural/Evidentiary Issues

#### 1. ADC Defendants' Statement of Facts

Local Rule of Civil Procedure 56.1(a) provides that the summary judgment movant must submit a separate statement of facts that is to "include only those facts that the Court needs to decide the motion. Other undisputed facts (such as those providing background about the action or the parties) may be included in the memorandum of law, but should not be included in the separate statement of facts." ADC Defendants submitted a separate Statement of Facts that includes 193 paragraphs. (Doc. 67.) These paragraphs are not in any type of chronological order, and they include background facts about the action, the parties, and ADC policies, as well as facts that are not material to deciding the Motion— facts that should not have been included. (*See id.*) ADC Defendants' failure to comply with Local Rule 56.1(a) made the summary judgment review process arduous. Defense counsel is reminded of her obligation to comply with the Federal and Local Rules of Civil Procedure. *See* LRCiv 83.1(f)(1)(A).

#### 2. Plaintiff's Statement of Facts

Under Local Rule 56.1(b), the party opposing a summary judgment motion must file a separate statement of facts that sets forth, for each of the movant's statements of fact, a correspondingly numbered paragraph indicating whether the nonmovant disputes the statement and a reference to the admissible evidence in the record that supports the

nonmovant's position if a statement is disputed. Plaintiff filed a separate Statement of Facts in opposition to Defendants' Statement of Facts, and he addressed all 193 paragraphs and indicated whether each statement was disputed or not. (Doc. 75.) Because most of ADC Defendants' asserted facts are background facts or immaterial, Plaintiff does not dispute the majority of ADC Defendants' statements. (*See id.*) As to those statements that Plaintiff disputed, he set forth factual statements supporting his position. (*See, e.g.*, *id.* ¶¶ 19, 52, 130, 148, 154, 174.) But, as ADC Defendants point out, Plaintiff's separate Statement of Facts is not signed under penalty of perjury, nor did Plaintiff submit a declaration in support of his Statement of Facts. (*See* Doc. 75.) ADC Defendants argue that, pursuant to *Soto v. Sweetman*, 882 F.3d 865 (9th Cir.2018), Plaintiff's unsworn statements are not competent summary judgment evidence and cannot be considered by the Court. (Doc. 81 at 2.)

In *Soto*, the Ninth Circuit held that a prisoner-plaintiff's unsworn statements related to his argument for tolling the statute of limitations were not competent evidence where those statements were not included in the verified complaint and were not set forth in an affidavit. 882 F.3d at 872. *Soto* specifically noted that the plaintiff knew how to file a sworn affidavit, having submitted two sworn affidavits in response to the defendants' summary judgment motion. *Id.* at 873. Neither of the affidavits, however, included facts relevant to the grievance process and the tolling argument. *Id.* The plaintiff instead raised his equitable tolling argument for the first time in his unsworn summary judgment response. The Court further found that even if it considered the unsworn statements in the plaintiff's response as competent evidence, his own conduct during the relevant time undermined his argument that he was entitled to equitable tolling. *Id.* at 874.[2]

---

[2] In his unsworn summary judgment response, the *Soto* plaintiff asserted that he was prevented from pursuing administrative remedies for years because he was told he had to wait for the Criminal Investigation Unit to complete its investigation. For this reason, the plaintiff argued he was entitled to equitable tolling. 882 F.3d at 872. But the record showed that the plaintiff did not wait for the investigation to be completed. Rather, he proceeded with the steps in the grievance process and, by the time he received notice that the Criminal Investigation Unit had completed its investigation, he had already appealed to the fourth step. Thus, he was not prevented from pursuing remedies. 882 F.3d at 874.

Unlike the litigant in *Soto*, Plaintiff did not set out some of his facts in opposition to summary judgment in affidavits and other facts in his unsworn Statement of Facts. Rather, he presented all of his facts in his Statement of Facts. (*See* Doc. 74–75.) And Plaintiff's asserted facts all relate to the merits of his underlying failure-to-protect claim because ADC Defendants' Motion is based entirely on the merits—they did not raise any arguments such as statute of limitations or failure to exhaust remedies, which would hinge on facts completely unrelated to those raised in the verified Complaint. (*See* Doc. 66.) Also, unlike *Soto*, where the outcome would not have differed even if the plaintiff's unsworn statements were considered as competent evidence, the existence of questions of fact as to some ADC Defendants' liability turns on whether the Court considers Plaintiff's response statements.

More importantly, *Soto* did not address and did not overrule *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003), which held that in the summary judgment analysis, the district court should have considered unsworn, inadmissible hearsay statements written by the plaintiff in a diary. The Ninth Circuit explained that, at summary judgment, courts "do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents." *Id.* at 1036.[3] Therefore, because the contents of the diary pertained to events within the plaintiff's personal knowledge, and because the diary's contents could be presented in an admissible form at trial—namely, the plaintiff could testify from her personal knowledge—the court could consider the diary contents in the summary judgment analysis. *Id.* at 1036-37.

*Fraser*'s holding is consistent with Rule 56, which provides that a party may object to material presented in opposition to summary judgment *if* that material "cannot be

---

[3] The Supreme Court has explained that this focus on the content over the form of evidence at the summary judgment stage applies to the *nonmovant*: "[w]e do not mean that the *nonmoving party* must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex*, 477 U.S. at 324 (emphasis added). Thus, "[m]aterial in a form not admissible in evidence may be used to avoid, but not to obtain summary judgment[.]" *Walters v. Odyssey Healthcare Mgmt. Long Term Disability Plan*, No. CV-11-00150-PHX-JAT, 2014 WL 4371284, at *3 (D. Ariz. Sep. 4, 2014) (internal quotation omitted); *see Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985) (noting that at summary judgment, "we treat the opposing party's papers more indulgently than the moving party's papers").

- 6 -

presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2); *see McAfee v. Metro. Life Inc. Co.*, 368 F. App'x 771, 772 n.1 (9th Cir. March 1, 2010) (the plaintiff's unsworn letter was admissible under Rule 56 "because it was based on personal knowledge, and the contents could be presented in admissible form at trial") (citation omitted); *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) ("[t]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial . . . "); *Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 310 F. Supp. 3d 1089, 1107 (S.D. Cal. 2018) (same) (collecting cases).[4] After the 2010 revisions to Rule 56, materials cited to dispute a fact "need only be *capable* of being presented in a form that would be admissible in evidence." *Mauer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017) (internal quotation omitted). Further, Rule 56 "expressly contemplates that affidavits are only one way to 'support' a fact; 'documents . . . declarations, . . . or other materials' are also supportive of facts." *Lee*, 859 F.3d at 355 (citing Fed. R. Civ. P. 56(c)(1)(A)).

ADC Defendants argue that Plaintiff's Statement of Facts is unsworn and not competent evidence, but they fail to assert that Plaintiff could not be presented the facts in a form that would be admissible at trial. (*See* Doc. 81 at 2–3.) As to most of the facts set forth in his Statement of Facts, Plaintiff clearly has personal knowledge and could present the facts in admissible form by testifying at trial. "To refuse consideration of these statements would elevate form over substance, in disregard of the legally indistinguishable holding of *Fraser v. Goodale*." *Rosenfeld v. Mastin*, No. CV 11-7002-DOC(E), 2013 WL

---

[4] Other circuits have considered unsworn statements and hearsay statements at the summary judgment stage based on this same reasoning. *See, e.g., Lee v. Offshore Logistical and Transport, LLC*, 859 F.3d 353, 354–56 (5th Cir. 2017) (the district court erred in rejecting a "signed but unsworn report" solely because the document was unsworn and remanding for consideration as to whether the material could be presented in a form that would be admissible at trial); *Fraternal Order of Police v. City of Camdem*, 842 F.3d 231, 238 (3d Cir. 2016) (the district court erred in failing to consider hearsay statements and should have instead determined if the out-of-court statements proffered by the plaintiffs would be admissible at trial); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (a district court may consider a statement "if the statement could be reduced to admissible evidence at trial or reduced to admissible form") (citation omitted).

- 7 -

5705638, at *5 (C.D. Cal. Oct. 15, 2013) (finding that under *Fraser* and its progeny, the district could should consider unsworn statements in the plaintiff's opposition concerning the force allegedly used on him during his arrest because the plaintiff has personal knowledge of the content of his statements and could present the statements through testimony at trial).

In sum, because this case is distinguishable from *Soto*, and absent any argument from ADC Defendants that Plaintiff's facts cannot be presented in an admissible form at trial, the Court will consider Plaintiff's unsworn statements to the extent they are within his personal knowledge and could be presented through testimony at trial.

**B.     Relevant Facts**

Where the parties' versions of events differ, the Court takes Plaintiff's facts as true. *See Anderson*, 477 U.S. at 255.

Plaintiff was housed in the Rast Unit, a maximum custody unit that houses protective custody prisoners.  (Doc. 67 ¶¶ 16, 21, 96 (in part).)  Plaintiff had been transferred to the Rast Unit in 2016 and was designated as an "IR 5" prisoner, referring to internal risk level 5, which is the highest level of risk to staff and other prisoners.  (*Id.* ¶ 12, 14, 73.)  On February 2, 2017, prisoner Jorge I. Acosta-Alvarez was moved to a single-man cell adjacent to Plaintiff's single-man cell in Pod 5.  (Doc. 67 ¶ 16; Doc. 75 ¶ 16.)  Acosta was also designated as an IR 5 prisoner.  (Doc. 67 ¶ 17.)

Prisoners in the maximum custody Rast Unit are also designated as Step I, Step II, or Step III prisoners pursuant to a step system that provides progressive opportunities to participate in jobs, programs, and other out-of-cell activities.  (*Id.* ¶ 90.)  Based on behavior and programming, prisoners can advance from Step I—the most controlled level—up to the less controlled Step II and Step III levels, which allow more privileges and movement outside of cells without restraints.  (*Id.* ¶¶ 91, 93; Doc. 67-1 at 70.)  At the relevant time, Plaintiff was designated as a Step III prisoner, and Acosta was a Step I prisoner.  (Doc. 67 ¶¶ 10, 123, 127.)

As a Step III prisoner, Plaintiff had a job as a Pod porter, which allowed him to move around the Pod to work.  (*Id.* ¶¶ 23, 155.)  Due to the amount of radio traffic on a single radio channel, correctional officers sometimes opened the wrong cell doors while Step III porters were working in the Pod.  (*Id.* ¶ 23.)

About a week after Acosta moved into the cell next to Plaintiff's, he began telling Plaintiff that he was going to stab and kill Plaintiff at the first opportunity.  (Doc. 1 at 5.) Plaintiff told Defendants Pontious and Charette each time Acosta made a threat.  Acosta made approximately ten such threats.  (*Id.*)  Plaintiff also informed Pontious that Acosta had told numerous prisoners, including Plaintiff, that he was going to fight them at recreation, and Plaintiff told Pontious that Acosta made threats involving the use of a weapon.  (Doc. 67 ¶ 19; Doc. 75 ¶ 19.)  In response, Pontious told Plaintiff that she had alerted her supervisors, had filed an information report, and had sent an email.  (Doc. 75 ¶¶ 20, 30, 133.)[5]

Charette facilitated a weekly programming class that Plaintiff was required to attend as part of the Step Program, and, around March 17, 2017, during one of these classes, Plaintiff informed Charette that he and other prisoners were being threatened by Acosta. (Doc. 67 ¶ 42; Doc. 75 ¶ 42.)  Plaintiff asked Charette to help him move or to get Acosta moved.  (Doc. 75 ¶ 43.)  ADC does not permit a prisoner to request that another prisoner be moved, and Charette advised Plaintiff of this, but Charette told Plaintiff that he could request that he himself be moved to another pod if he was in fear for his life due to an imminent threat.  (Doc. 67 ¶ 46; Doc. 75 ¶ 46.)  Plaintiff requested to be moved because he did not want to be assaulted, and stated that he was in fear for his life.  (Doc. 75 ¶¶ 47, 52.)  Charette told Plaintiff he would contact count movement on Plaintiff's behalf.  (*Id.* ¶ 52.)  Charette also advised Plaintiff to speak to security personnel about his issues

_____

[5] The Court considers Plaintiff's assertion as to what Pontious told him because Plaintiff can testify about her statements at trial.  The statements are admissions of a party opponent and are not barred by the hearsay rule.  *See* Fed. R. Evid. 801(d)(2)(A).

because they might be able to do something Charette could not, and Plaintiff agreed to do so. (Doc. 67 ¶¶ 48–49; Doc. 75 ¶¶ 48–49.)[6]

Meanwhile, Plaintiff sent Defendant Metzler four inmate letters about the threats made by Acosta to Plaintiff. (Doc. 1 at 6.)

On March 22, 2017, Plaintiff spoke with a Psych Associate, Annette Holland, about Acosta's threats. (*Id.*) Holland told Plaintiff that she would speak with Defendant Captain Kaufman. (*Id.*) Later that day, Holland returned and told Plaintiff that she had talked to Kaufman about Plaintiff and Acosta and that Kaufman was receptive. (*Id.*)[7]

Also on March 22, 2017, Plaintiff sent the first of several inmate letters to Defendant Associate Deputy Warden Lee that explained the ongoing threats by Acosta. Plaintiff handed the inmate letter to Pontious. (Doc. 75 ¶ 154.) On this day, Plaintiff was working as a Pod porter, so he collected inmate letters in the Pod and handed all of them directly to Pontious. (*Id.* ¶ 155.)

On the morning of April 9, 2017, Officer Tovar entered Pod 5 and announced "Rec," meaning that he would be escorting prisoners to recreation. (Doc. 67 ¶ 184 (in part); Doc. 75 ¶ 184.) Step III prisoners get six hours of recreation a week. (Doc. 67-1 at 89.) According to Plaintiff, the six hours are divided among three days a week. (Doc. 75 ¶ 104.) One day a week, there is "priority" Step recreation, where Step III prisoners are escorted to the recreation enclosures unrestrained with other Step III prisoners. (Doc. 67 ¶¶ 23, 25 (in part); Doc 75 ¶ 25, 104.) On the other "non-priority" Step recreation days, all prisoners, regardless of Step level, are escorted to the recreation enclosures together. (Doc. 75 ¶ 105.)

---

[6] For reasons stated in footnote 5, the Court also considers Plaintiff's assertion as to what Charette told him.

[7] This statement by a nonparty is inadmissible hearsay in this form, but if Plaintiff were to call Holland as a witness at trial, she could testify as to what Kaufman told her under Rule 801(d)(2)(A), statement of a party opponent. *See Sobin v. Lowrey*, No. 3:14-CV-1500 JD, 2016 WL 2643456, at *2 (N.D Ind. May 9, 2016) (at summary judgment, the court could consider the plaintiff's assertions that three named nonparty prison officers told him the defendant had ordered the shakedown cell searches because if the plaintiff called these witnesses at trial, they could testify as to what the defendant told them under Rule 801(d)(2)(A), statements of a party opponent).

On these days, when all Step levels are escorted together, all prisoners are handcuffed during escort to and from the recreation enclosures. (*Id.* ¶¶ 25, 105; Doc. 67 ¶ 25.) Although Step I and Step III prisoners are escorted to the recreation enclosures together, they are not placed in the enclosures together and do not participate in recreational activities together. (Doc. 67 ¶ 26; Doc. 75 ¶¶ 26, 182.)

April 9, 2017 was not a Step III priority recreation day for Plaintiff's Pod. Therefore, if Plaintiff wanted to go to recreation that day, his only choice was to go with the Step I prisoners. (Doc. 75 ¶¶ 28, 106, 185.) After Tovar announced "Rec," he began searching and cuffing the prisoners for the escort to the recreation enclosures. (*Id.* ¶ 184.) At the time, Plaintiff used a medically-approved cane, so Tovar applied a belly-chain restraint to him and the three other prisoners going to recreation were handcuffed behind their backs. (Doc. 67 ¶ 187; Doc. 63, Video Seg. 1.) The four prisoners walked in front of Tovar in a single-file line; Plaintiff was the second in line, with Acosta right behind him. (Doc. 67 ¶ 188; Doc. 63, Video Seg. 1.) As soon as the line exited the building, Acosta slipped his left hand out of the handcuffs, drew back his right arm, and swung and punched Plaintiff on the right of his head. (Doc. 63, Video Seg. 1.) Using the metal handcuffs—which were attached to Acosta's right hand—as a weapon, Acosta struck Plaintiff twice in the side of the head. The first blow was to Plaintiff's right ear and the second was to his upper right neck at the base of his skull. (Doc. 1 at 6; Doc. 74 at 7.) Tovar ran after Acosta, pushed him away from Plaintiff, and directed him to stop fighting. (Doc. 67 ¶ 190). Tovar used the microphone at his shoulder to call for assistance. (*Id.*) Acosta refused to back down and began to walk toward Tovar and Plaintiff. Tovar deployed chemical agents to Acosta's face, after which responding staff arrived and restrained him. (*Id.* ¶¶ 191–192.) Plaintiff, who suffered two lacerations to his right ear, was escorted to intake to wait for the medical staff. (*Id.* ¶ 193; Doc. 1 at 5.)

Following the assault, Plaintiff sought to have criminal charges and an investigation into how the assault was allowed to happen and why staff ignored credible threats and refused to act or move Plaintiff. (Doc. 1 at 6.) Plaintiff submitted inmate letters requesting

that the Criminal Investigation Unit investigate the incident, but the Criminal Investigation Unit, shift supervisors, and Captain Kaufman all ignored his requests for an investigation. (*Id.* at 6–7.)

### C. Legal Standard

The Eighth Amendment requires prison officials to protect prisoners from violence at the hands of other prisoners because "being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994); *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009). To prevail on a failure-to-protect claim, a plaintiff must demonstrate facts that satisfy a two-part test: (1) that the alleged deprivation is, objectively, sufficiently serious, and (2) that the official is, subjectively, deliberately indifferent to the inmate's safety. *Id.* at 834. Thus, there is an objective and subjective component to an actionable Eighth Amendment violation. *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002). Under the objective prong, "[w]hat is necessary to show sufficient harm for the purposes of the Cruel and Unusual Punishment Clause depends on the claim at issue." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). For a failure to protect claim, the prisoner must show that he was placed into conditions that posed a substantial risk of serious harm. *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

The subjective prong requires "more than ordinary lack of due care for the prisoner's interest or safety." *Farmer*, 511 U.S. at 835 (quotation omitted). To prove deliberate indifference, a plaintiff must show that the official knew of and disregarded an excessive risk to inmate safety. *Id.* at 837. To satisfy the knowledge component, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and the official must also draw the inference. *Id.* The plaintiff need not show that the defendant acted or failed to act believing that harm would actually befall the inmate; "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. To prove knowledge of the risk, the plaintiff may rely on circumstantial evidence. *Id.*

Prison officials who actually knew of a substantial risk to prisoner health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. *Id.* at 844. Prison officials do not escape liability, however, if the evidence shows that that they "merely refused to verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that [they] strongly suspected to exist." *Id.* at 843 n.8.

### D.   Discussion

In assessing liability for deliberate indifference, the Court must take an individualized approach and consider the duties and discretion of each defendant, and whether a defendant "was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

### 1.   Sergeant Pontious

Pontious argues that there is no evidence that she was subjectively aware of facts from which the inference could be drawn that a substantial risk of serious harm to Plaintiff existed or that she actually drew the inference that such a risk existed. (Doc. 66 at 17.) Pontious argues that deliberate indifference requires an official to have more than a mere suspicion of an attack, and, here, Pontious did not have even a suspicion that Acosta would attack Plaintiff. (Doc. 66 at 18.)

But Plaintiff alleges that he personally informed Pontious, as many as ten times, of specific threats made by Acosta, including threats that Acosta was going to kill Plaintiff, that he was going to use a weapon against Plaintiff, and that he was going to fight Plaintiff at recreation. (Doc. 1 at 5; Doc. 74 ¶ 19.) Plaintiff alleges that he personally informed Pontious verbally of the threats made by Acosta and that he wrote inmate letters regarding the threats and personally delivered them to her. (Doc. 74 at 9–10; Doc. 75 ¶ 19.) The Court is required to take these allegations as true at summary judgment. And there is no dispute that Acosta subsequently attacked Plaintiff as they went to recreation. A reasonable jury could find that in light of the repeated reports directly to Pontious that Acosta was

threatening to harm Plaintiff, Pontious had more than a mere suspicion that Acosta posed a risk to Plaintiff's safety.

Pontious contends that she did not perceive a risk because all prisoners in the Rast Unit are maximum custody and IR 5, and there were procedures in place to ensure prisoner safety—prisoners are housed in single cells and restraints are used on all Step I prisoners when they are out of their cells. (Doc. 66 at 17; Doc. 67, Ex. A, Pontious Decl. ¶¶ 22, 24, 28.) But these safety procedures would not protect against possible harm in the event that the wrong cell doors were opened while Plaintiff was working in the Pod, as he alleges happened on occasion. Further, the record shows that at least two days a week Plaintiff was escorted to recreation enclosures with Step I prisoners. And, as evidenced by the video, prisoners were escorted to recreation by a single officer, which does not guarantee safety even where prisoners are handcuffed. *See, e.g.*, *Fanning v. Johnson*, Nos. 2:13-CV-1957-VEH-HGD, 2:13-CV-2126-VEH-HGD, 2015 WL 4068710, at *4 (N.D. Ala. July 1, 2015) (in addressing an Eighth Amendment excessive force claim, the court found that the officers reasonably perceived a threat because it was undisputed that "a handcuffed inmate can still present a danger to officers because of his ability to bite, kick, and head butt"); *Gamble v. Peavyhouse*, No. 5:12-CV-332-KKC, 2014 WL 5106360, at *7, 9 (E.D. Kent. Sept. 30, 2014) (in Eighth Amendment excessive force case, the defendants argued there was a need for force because the handcuffed prisoner-plaintiff attempted to head butt an officer); *United States v. Evans*, Nos. 1:06-CR-00051 OWW, 1:06-CR-00131 OWW, 1:06-CR-00175 OWW, 2006 WL 8439940, at *6–7 (E.D. Cal. Aug. 10, 2006) (in addressing a challenge to the requirement that criminal defendants be shackled during initial appearances, the district court noted that the use of restraints had greatly reduced, but not eliminated, prisoner violence and incidents, and the court cited instances where restrained prisoners head butted other prisoners, removed a waist chain while handcuffed to it and beat another prisoner, swung an elbow at an attorney, and managed to use weapons such as pencils or paper clips to attack someone). Indeed, ADC Defendants describe the IR 5 prisoners in the Rast Unit as prisoners with the highest risk of "committing violence within

the perimeter and/or under the direct supervision of Department staff." (Doc. 66 at 3; Doc. 67 ¶ 73.) Given this known risk even when prisoners are supervised by staff, the fact that restraints would be used while prisoners were out of cells would not eliminate a risk to prisoner safety. A reasonable jury could find that this risk, combined with evidence that Pontious was repeatedly informed of threats Acosta made against Plaintiff, sufficiently establishes Pontious's knowledge of a substantial risk of harm to Plaintiff's safety.

Finally, Pontious argues that she did not perceive a risk of harm because she believed that if Plaintiff truly feared Acosta meant to harm him, Plaintiff would not "voluntarily choose" to be escorted to recreation with Acosta since Plaintiff could go unrestrained to recreation with other Step III prisoners. (Doc. 66 at 18.) But if Plaintiff went to recreation only when he could be escorted with other Step III prisoners, he would get just one day of recreation a week. Drawing all inferences in Plaintiff's favor, Pontious was aware that Plaintiff could only attend recreation once a week with other Step III prisoners and that on all other days prisoners were escorted to recreation together regardless of their Step levels. (Doc. 72 at 10.) Given the limited out-of-cell opportunities in the Rast Unit and the importance of exercise to the mental and physical health of prisoners, it was not unreasonable for Plaintiff to "choose" to go to recreation on days that he would be escorted with Acosta as opposed to forgoing recreation all but one day a week. *See Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) ("[s]ome form of regular outdoor exercise is extremely important to the psychological and physical well being of [prisoners]"); *see also Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1994) (six-week period in which prisoner was allowed only forty-five minutes per week of outdoor exercise implicates the Eighth Amendment). In these particular circumstances, and in light of Plaintiff's numerous and repeated reports directly to Pontious that Acosta threatened Plaintiff, there is a genuine issue of material fact whether Pontious was aware of a substantial risk of serious harm to Plaintiff.

Pontious avers that she had no authority over prisoner classification or housing. (Doc. 67, Ex. A, Pontious Decl. ¶ 4.) But this does not demonstrate that she was unable to

take steps in response to a threat to a prisoner's safety. Although Plaintiff states that Pontious told him she sent an Information Report and an email regarding the threats he reported, Pontious maintains that she did not create an Information Report or send an email. (*Id.* ¶ 31.) Construing the evidence in Plaintiff's favor, Pontious did not take any action in response to the reported threats to Plaintiff's safety, and Acosta subsequently attacked Plaintiff. A reasonable jury could find that Pontious' failure to take any action in response to the reported threats and the risk of serious harm to Plaintiff's safety constituted deliberate indifference. *See Farmer*, 825 U.S. at 832 (the Eighth Amendment imposes duties on prison officials, who "must take reasonable measures to guarantee the safety of the inmates"); *Winfield v. Bass*, 106 F.3d 525, 532 (4th Cir. 1997) ("officials may be liable for completely failing to take *any* action to avert an attack by one prisoner on another when they knew that a substantial risk of harm existed") (emphasis in original). Accordingly, the Court will deny summary judgment to Pontious on the merits.

### 2. Charette

Charette argues that he was not deliberately indifferent to a risk of harm to Plaintiff because safety procedures were in place in the Rast Unit, Plaintiff said he did not want to be moved, and Charette acted reasonably by informing Plaintiff to pursue his security and housing complaints with those who had the authority that Charette lacked. (Doc. 66 at 18-19.) Charette further argues that he cannot be faulted for any harm to Plaintiff because Plaintiff failed to mention Acosta in his request to add prisoners to his Do-Not-House-With list. (*Id.* at 19.)

As discussed above, there is a question of fact whether single cell housing and a policy requiring restraints to be used on all Step I prisoners were sufficient to eliminate a risk of violence, especially where Plaintiff specifically notified ADC Defendants of repeated threats made by Acosta. Plaintiff alleges that he personally informed Charette numerous times of Acosta's threats. (Doc. 1 at 5.) And Charette acknowledges that he discussed the issue with Plaintiff and advised him that he could request to be moved if he was in fear for his life. (Doc. 67 ¶ 46.) Although the parties dispute Plaintiff's response,

the Court must take as true Plaintiff's assertion that he told Charette that he requested to be moved because he did not want to be assaulted.  (Doc. 74 at 10; Doc. 75 ¶ 47.)

Charette avers that if Plaintiff had advised Charette that he was in fear for his life, Charette would have immediately separated him and secured him pursuant to the ADC policy governing protective custody.  (Doc. 67, Ex. B, Charette Decl. ¶ 23.)  Charette's speculation as to what he would have done in the situation is subject to a credibility dispute that cannot be resolved on summary judgment.  *See Anderson*, 477 U.S. at 249–50. Charette's statement is otherwise insufficient because "affidavits in support of a motion for summary judgment require more than a prison officer's pledge of good intentions; such affidavits must demonstrate personal knowledge of the events to preclude a finding that material issues of fact exist with respect to the claim."  *Aguilar v. Kuloloia*, No. 2:06-CV-01002-KJD-PAL, 2007 WL 2891503, at *9 (D. Nev. Sept. 28, 2007).  Charette's statement is sufficient to show, however, that even though he did not have authority in his position to facilitate a prisoner's transfer, he could have taken some action to secure Plaintiff's safety.  According to the record, he did not take any action.

To support his assertion that Plaintiff should have, but failed, to request to add Acosta to his Do-Not-House-With list, Charette relies on copies of inmate letters in which Plaintiff requested to add numerous prisoners to his Do-Not-House-With list.  Plaintiff explains that he started this request via inmate letters in 2016, more than a year prior to the assault at issue here.  (Doc. 75 ¶ 173.)  Plaintiff's first two inmate letters requesting that 22 prisoners be added to his Do-No-House-With list are dated April 3, 2016.  (Doc. 67-2 at 41, 43.)  Plaintiff sent more inmate letters regarding the same request on April 17, 2016. (*Id.* at 45–48.)  In May 2016, Plaintiff received a written response informing him that Officer Compton was working on the issue.  (*Id.* at 50.)  On February 21, 2017, Plaintiff sent an informal complaint to Deputy Warden Mooney in which he stated that the issue regarding additions to his Do-Not-House-With list had been "kicked" down to Officer Compton and was then taken over by Officer Metzler, but Plaintiff had not received a response.  (*Id.* at 52.)  Plaintiff sent another inmate letter to Deputy Warden Mooney on

March 12, 2017, asking why he had not received a response to his February 21, 2017 inquiry. (*Id.* at 54.) Charette notes that neither of these inmate letters to Deputy Warden Mooney, which were written after Acosta moved into the cell next to Plaintiff, mention threats by Acosta or request that Acosta be added to Plaintiff's Do-Not-House-With list. (Doc. 66 at 19.)

Plaintiff alleges, however, that he submitted separate inmate letters prior to the assault that were specific to the threats made by Acosta. (Doc. 1 at 6; Doc. 75 ¶ 174.) Plaintiff explains that he does not have copies of these letters because ADC no longer uses inmate letter forms that include a carbon copy for prisoners. (Doc. 75 ¶ 130, 154.)[8] To obtain a copy of an inmate letter, a prisoner must go through the librarian, but prisoners in the maximum custody Rast Unit cannot simply walk to the library. (*Id.*) Instead, the librarian picks up and drops off materials for copying once a week. (*Id.*) Consequently, when a prisoner seeks to submit an inmate letter for a time-sensitive issue and cannot wait for the librarian, he will not be able to obtain a copy of the inmate letter. (*Id.*) In their Reply, ADC Defendants do not refute this description of the current inmate letter forms and the need to get copies through the librarian. (*See* Doc. 81.) Taking Plaintiff's allegations as true, he raised concerns about Acosta in inmate letters at the relevant time, and the fact that he failed to include a complaint about Acosta in his separate inmate letters related to his ongoing grievance to add prisoners to his Do-Not-House-With list does not undermine his claim in this action.

In short, there are questions of fact whether Charette was aware of the threats made by Acosta and the risk of serious harm to Plaintiff, and whether Charette was in a position to take some steps in response to the risk but failed to take any action. A reasonable jury could resolve these questions in Plaintiff's favor and find that Charette acted with

---

[8] In one of his 2016 inmate letters, Plaintiff references the carbon copy form of inmate letters. (Doc. 67-2 at 45.) He wrote that he was using the inmate letter form to submit his complaint because it was the only type of form that had a carbon copy, thereby ensuring that he would have a copy in the event it was alleged that he never submitted it. (Doc. 67-2 at 45.)

deliberate indifference to the risk to Plaintiff's safety. The Court will therefore deny summary judgment to Charette on the merits.

### 3. Lee

Plaintiff alleges that he informed Lee, who was the Associate Deputy Warden, about the threats made by Acosta through four inmate letters. (Doc. 1 at 6.) He states that he sent the first inmate letter, which explained Acosta's ongoing threats to assault Plaintiff with a weapon, on March 22, 2017. (Doc. 74 at 6; Doc. 75 ¶ 154.) Lee avers that she never received any inmate letters or other communications from Plaintiff concerning threats made by Acosta prior to the April 9, 2017 assault. (Doc. 67, Ex. F, Lee Decl. ¶ 3.) She further avers that she never received any incident reports, emails, or other communications from any ADC staff concerning threats made by Acosta prior to the assault. (*Id.* ¶ 5.) Lee therefore argues that she had no knowledge of the threats made by Acosta and the risk of harm to Plaintiff. (Doc. 66 at 20–21.)

In *Kartman v. Markle*, 582 F. App'x 151, 154 (4th Cir. Aug. 22, 2014), in which the prisoner-plaintiff brought a § 1983 claim alleging a failure to protect, the plaintiff stated that he informed the defendant official though grievances and letters of the risk of harm he faced from other prisoners. The defendant claimed he never received any of the grievances and therefore had no knowledge of the risk. The district court assumed that the plaintiff filed grievances and letters as he claimed, and that these grievances would have put a reasonable person on notice of an excessive risk of harm to the plaintiff. *Id.* at 154–155. But the district court concluded that there was no evidence the defendant official actually received the grievances and, on this basis, granted summary judgment to the defendant. *Id.* The evidence showed that the grievance policy required grievances to be filed with the defendant official, who was the Jail Administrator, and the defendant official confirmed that grievances would be placed in his mailbox if they were addressed to him. *Id.* at 155. The Fourth Circuit found that, based on this evidence, there were material issues of fact whether the plaintiff filed the grievances and letters and, if so, whether the defendant official "either received them or was willfully blind to their existence." *Id.* at 155 (citing

*Bowen v. Manchester*, 966 F.2d 13, 17 (1st Cir. 1992) (finding deliberate indifference could be shown by actual knowledge or willful blindness of serious risk)).  Because it was unclear whether the defendant official was in possession of or aware of the grievances, summary judgment for the defendant was vacated.  *Id.*

Here, there is no claim by ADC Defendants that Plaintiff did not know how to use the grievance process.  Indeed, Plaintiff states in his Complaint that he exhausted remedies for his failure-to-protect claim, and ADC Defendants did not challenge that statement with an argument for nonexhaustion.  (Doc. 1 at 5.)  Nor do ADC Defendants dispute Plaintiff's description of the process for submitting inmate letters in the Rast Unit—that inmate letters were given to Sergeant Pontious and no copies of the forms were provided unless prisoners obtained them from the librarian before submitting the forms to Pontious.  Plaintiff states that he provided his March 22, 2017 inmate letter about Acosta's threats to Pontious.  (Doc. 75 ¶ 154.)  In her declaration, Pontious does not deny that she collected inmate letters from prisoners or the Pod porter, nor does she deny that Plaintiff handed her an inmate letter on this date.  (*See* Doc. 67, Ex. A, Pontious Decl.)  And Plaintiff alleges that Pontious told him, prior to April 9, 2017, that Lee received his inmate letter.  (Doc. 75 ¶ 157.)  In her declaration, Lee indicates that she received other inmate letters Plaintiff submitted related to his ongoing request to add prisoners to his Do-Not-House-With list.  (Doc. 67, Ex. F, Lee Decl. ¶¶ 15, 19–20.)  This evidences that, in her position, Lee received inmate letters.  Based on the reasoning in *Kartman*, there are material issues of fact whether Plaintiff submitted the March 22, 2017 inmate letter to Lee via Pontious and, if so, whether Lee received it and ignored it.  These factual issues cannot be resolved without making credibility determinations, which the Court cannot do at summary judgment.  *See Anderson*, 477 U.S. at 249–50.

Plaintiff asserts that the inmate letter sent to Lee explained "the entire situation" regarding ongoing threats from Acosta that he was going to assault Plaintiff with a weapon.  (Doc. 1 at 5; Doc. 75 ¶¶ 154–155.)  This information would be sufficient to put Lee on notice of a substantial risk of harm to Plaintiff's safety, and this notice would obligate her

to take some responsive action.  *See Farmer*, 511 U.S. at 843 n.8 (a prison official cannot escape liability "if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist (as when a prison official is aware of a high probability of facts indicating that one prisoner has planned an attack on another but resists opportunities to obtain final confirmation . . . )"); *see Swan v. United States*, 159 F. Supp. 2d 1174, 1182 (N.D. Cal. 2001) ("[t]urning a blind eye to the relevant surrounding facts will not shield a prison official from liability").  If a jury believes that Lee received Plaintiff's inmate letter or multiple inmate letters and was aware of a substantial risk to Plaintiff's safety, it could find that Lee's failure to take any action in response to the risk constituted deliberate indifference.  Summary judgment will therefore be denied to Lee.

### 4.    Metzler

Plaintiff alleges that he sent the first of four inmate letters to Metzler on March 22, 2017, and that he handed this inmate letter directly to Pontious.  (Doc. 74 at 6; Doc. 1 at 6.)  He states that the inmate letter explained the entire situation regarding threats made by Acosta.  (Doc. 1 at 6.)  Plaintiff also asserts that Pontious and Charette both told him that they discussed Acosta's threats with Metzler.  (Doc. 75 at 133.)[9]  And Plaintiff states that on April 6, 2017, during a class, Charette asked Plaintiff about Acosta and told Plaintiff that he had told his boss—Metzler—and a move would be made.  (Doc. 74 at 6.)  Metzler avers that he never received inmate letters or any other communications from Plaintiff concerning threats made by Acosta prior to April 9, 2017, nor did he receive any incident reports or other communications from staff about such threats.  (Doc. 67, Ex. C, Metzler Decl. ¶¶ 76, 78.)  Metzler asserts that Pontious and Charette spoke to him about Acosta, but only about Acosta's loud and disruptive behavior.  (*Id.* ¶¶ 80–81.)  Metzler therefore argues that he had no knowledge of the threats or of a risk of harm to Plaintiff.  (Doc. 66 at 20–21.)

---

[9] The Court considers Plaintiff's statement as to what Pontious and Charette told him.  *See* supra n.5.

Metzler does not deny that, in his position as a CO IV, he received inmate letters. (*See* Doc. 67, Ex. C, Metzler Decl.)  Moreover, his declaration statements show that he worked with and communicated with Pontious and Charette.  (*Id.* ¶¶ 80–81.)  In short, the same factual disputes discussed above exist with respect to Metzler.  If a jury believes that Metzler received Plaintiff's inmate letter and discussed Acosta's threats with Pontious and Charette, it could find that Metzler was aware of a substantial risk to Plaintiff's safety and that Metzler's failure to take any action in response to the risk constituted deliberate indifference.  Summary Judgment will be denied to Metzler.

### 5.    Kaufman

Plaintiff alleges that on March 22, 2017, he spoke to Psych Associate Holland, who told him she would speak to Kaufman about Acosta's threats to Plaintiff, and, later that same day, Holland informed Plaintiff that she in fact talked to Kaufman.  (Doc. 75 at 148.)  Plaintiff identified Kaufman as a Captain who was Chief of Security.  (Doc. 1 at 3.)  In his declaration, Kaufman avers that he did not have personal knowledge of any threats by Acosta to Plaintiff. (Doc. 67, Ex. E, Kaufman Decl. ¶ 3.)  Kaufman stated that was a Captain, but that he never received any communications from any ADC staff concerning threats made by Acosta.  (*Id.* ¶ 7.)  Kaufman does not indicate whether a Corizon medical staff member communicated with him about threats made by Acosta, nor does he confirm whether he was Chief of Security.  (*See id.*)

The evidence related to Kaufman is limited, but factual disputes exist that must be resolved by credibility determinations.  A reasonable jury could find that Kaufman was informed of the risk of harm to Plaintiff's safety and that he was in a position to take steps to avert the harm, but failed to do so.  Accordingly, summary judgment will be denied to Kaufman.

### E.    Qualified Immunity

Pontious and Charette argue that they are entitled to qualified immunity.  (Doc. 66 at 21–24.)  Government officials are entitled to qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which

a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230–32, 235–36 (2009) (courts may address either prong first depending on the circumstances in the particular case). In the qualified immunity analysis, the court must consider all disputed facts in the light most favorable to the nonmovant. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017).

For a right to be clearly established there does not have to be a case directly on point, but "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *White v. Pauly*, — U.S. —, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, — U.S. —, 136 S. Ct. 305, 308 (2017)). Clearly established law "must be particularized to the facts of the case," and "should not be defined at a high level of generality." *White*, 137 S. Ct. at 552 (quotation and citation omitted). A right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 137 S. Ct. at 551). Once the right at issue is defined, the court must "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated" that right. *Id.* If there is no such case, then the right was not clearly established. *See id.* at 1117-18. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations omitted). "The Supreme Court has made clear that 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir.2011) (quoting *Hope*, 536 U.S. at 741).

Here, the Court has already determined that there are triable issues of fact whether Pontious and Charette violated Plaintiff's Eighth Amendment rights. Qualified immunity therefore turns on the second prong—whether the right at issue was sufficiently clearly established for these two Defendants to know that their conduct was unlawful. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Pontious and Charette argue that a reasonable officer would not have understood that Acosta's mere presence in a separate cell in the Rast Unit would pose a substantial risk to Plaintiff in light of the fact that all Step I prisoners are handcuffed when escorted to recreation, nor would they have anticipated that Acosta posed a risk where Plaintiff claimed that Acosta threatened him but did not include Acosta on his Do-Not-House-With list. (Doc. 66 at 23–24.) This argument ignores Plaintiff's assertion—which the Court must consider—that he repeatedly informed Pontious and Charette of Acosta's threats against him and that Plaintiff filed numerous inmate letters specific to Acosta's threats. Further, the Court has already determined that there are questions of fact whether the procedures at the Rast Unit were sufficient to avert the risk.

Pontious and Charette rely on *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050-51 (9th Cir. 2002), to argue that it would not have been clear to a reasonable official in the circumstances when a risk changed to a substantial risk of serious harm. (*Id.* at 23.) *Ford* is distinguishable. There, prison officials housed the victim with a cellmate who had been classified as a "predator" due to violent behavior, and the cellmate killed the victim. *Id.* at 1045. The Ninth Circuit found that based on the information that the defendant officials possessed—that the cellmate had successfully housed with the plaintiff in the past, and that both the plaintiff and the cellmate wished to be housed together—a reasonable official could have thought that the cellmate did not pose a substantial risk of serious harm to the plaintiff. *Id.* at 1051–53.

Here, Plaintiff did not wish to be housed near Acosta. Plaintiff repeatedly informed Pontious and Charette that Acosta made threats to Plaintiff's life, and Plaintiff specifically told Charette that he wanted to be moved because he did not want to be assaulted. There

is a question of fact whether, with this information in hand, a reasonable officer would have known of a substantial risk of serious harm to Plaintiff. *See Farmer*, 511 U.S. at 833–34 (prison officials violate the Eighth Amendment when they disregard a known risk to a prisoner's safety); *Robinson v. Prunty*, 249 F.3d 862, 866 (9th Cir. 2001) (it is clearly established that a prison official's failure to respond to a known, credible threat to a prisoner's safety violates the prisoner's Eighth Amendment rights). Consequently, summary judgment based on qualified immunity will be denied.

## V.    Count Two—Medical Care

### A.    Procedural/Evidentiary Issues

Corizon Defendants contend that Plaintiff's Statement of Facts in Opposition to their Statement of Facts does not comply with the Federal and Local Rules of Civil Procedure and, consequently, summary judgment should be granted in their favor. (Doc. 79 at 2–3.) Corizon Defendants submit Plaintiff failed on many occasions to provide citations to specific admissible portions of the record and failed to provide a statement of facts with proper citations to support his response. (*Id.*) They further submit that Plaintiff's response memorandum failed to cite to specific paragraphs within his Statement of Facts. (*Id.* at 3.)

Plaintiff is proceeding pro se, and the Court must view his response liberally. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (courts must "construe liberally motions papers and pleadings filed by pro se inmates and . . . avoid applying summary judgment rules strictly"); *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988). Plaintiff's Statement of Facts includes 39 paragraphs that correspond to each of Corizon Defendants' 39 paragraphs set forth in their Statement of Facts, and, in each paragraph, Plaintiff indicates whether he opposes or does not oppose each factual assertion. (Doc. 73.) For those paragraphs that he opposes, Plaintiff asserts facts that are within his personal knowledge. (*See id.*) In addition, for most of the paragraphs that he opposes, Plaintiff cites to specific Exhibits or medical records to support his disputes. (*See, e.g.*, *id.* ¶¶ 6–8, 11–14, 18–19, 21–22.) Further, contrary to Corizon Defendants' assertion,

Plaintiff's memorandum cites to specific paragraphs in his Statement of Facts that support his assertions. (*See* Doc. 72.) Plaintiff's response filings therefore comply with the procedural rules. Corizon Defendants' request for summary judgment based on a failure to comply with the applicable procedural rules will be denied.

Moreover, for the reasons discussed previously, the Court will consider Plaintiff's unsworn Statement of Facts and Response to the extent that the content of his statements in those documents is within his personal knowledge and could be presented in admissible form through testimony at trial. *See Fraser*, 342 F.3d at 1036.

## B.    Relevant Facts

On the morning of April 9, 2017, an Incident Command System response was called after Acosta's assault on Plaintiff. (Doc. 65 ¶ 6.) Nurse Lexie Gamble responded and noted in the medical record that Plaintiff had a wound to the right tip of his ear that included two vertical lacerations. (Doc. 65 at 86.) Nurse Gamble was able to control the bleeding with pressure, the wound was cleaned, and steri-strips were applied. (*Id.*) Plaintiff reported to Nurse Gamble that he had seen a large brown flash and that he was seeing squiggly lines, was dizzy and queasy, and had a constant ringing in his right ear. (Doc. 73 ¶ 6.) Nurse Gamble did not report these symptoms in the medical record, nor did she perform any type of concussion test or screening. (*Id.*; *see* Doc. 65 at 86.) Nurse Gamble documented that Plaintiff was grimacing but calm. His heart rate was elevated at 106, and Plaintiff states that he was not calm but in severe pain. (Doc. 73 ¶ 6; Doc. 65 at 86.) Nurse Gamble contacted the on-call provider, Defendant NP Ende, and NP Ende called Defendant Dr. Young, the Assistant Regional Medical Director. (Doc. 65 at 90–91.) Nurse Gamble was advised to keep the wound wet with dressing changes twice a day and to bring Plaintiff to the medical hub at 7:00 a.m. the next morning to have Defendant Dr. Elijah assess whether stitches could be done onsite or if a referral to "plastics" would be needed. (*Id.*) After Nurse Gamble treated Plaintiff, he was returned to his cell. (*Id.* at 91, 93; Doc. 73 ¶ 8.)

Around 9:00 a.m. the next morning, Plaintiff saw Nurse Mia Myers, who noted Plaintiff's pain at 8/10, and that there was pain and bright, red, bloody drainage in the right

ear.  (Doc. 65 at 76–79.)  Plaintiff reported that he had seen a large brown flash upon injury and he had squiggly lines in his vision, he was dizzy and queasy, and he had vomited throughout the night of April 9 and early morning of April 10.  (Doc. 73 ¶ 11.)  Nurse Myers did not examine Plaintiff's eyes, nor did she fully examine his ears.  (*Id.*)  She documented ear trauma from being hit with handcuffs to the right ear; that an otoscope was not available; that the left and right ear canals were normal; that the eyes were clear; and that the neck was supple.  (*Id.* at 77–78.)[10]

Plaintiff then saw Dr. Elijah, who noted the reported assault, that Plaintiff had sustained two deep lacerations to the right ear, and that Plaintiff denied losing consciousness.  (*Id.* at 70.)  Plaintiff reported his vision symptoms, dizziness and queasiness, and that he had vomited throughout the night and that morning.  (Doc. 73 ¶ 12.)  He also reported a constant ringing in his right ear, pain in his neck where he had been struck, and a pain level of 8/10.  (*Id.*)  Plaintiff requested that Dr. Elijah complete a concussion exam and examine his right ear canal, neck, and eyes.  Dr. Elijah stated that she was too busy, but she told Plaintiff to submit a Health Needs Request (HNR) about his concerns.  (*Id.* ¶ 19; Doc. 72 at 6.)  Dr. Elijah documented the length of the lacerations at 3 cm and 2 cm, that cartilage was visible and transected but there was no tissue loss, and she applied local anesthesia and thirteen stiches to the right ear.  (Doc. 65 at 70–71.)  Dr. Elijah ordered suture removal in five days and three days of bed rest, and she prescribed antibiotic packets and Indomethacin, an anti-inflammatory for pain that was stronger than the one Plaintiff was currently on.  (Doc. 65 ¶ 16; Doc. 73 ¶¶ 16, 19.)

On April 12, 2017, Plaintiff submitted an HNR stating that his right ear had not stopped ringing since the assault and that he still had pain in his neck.  (Doc. 65 at 136.)

On April 15, 2017, Plaintiff saw Nurse Gamble for suture removal.  (*Id.* at 61–62.)  She removed the thirteen stiches, and there was no drainage.  (*Id.* at 62.)  Plaintiff reported ringing in his right ear and that he could hear finger rubs in both ears but better in his left

---

[10] An otoscope is an instrument used for examining the ear.  Stedmans Medical Dictionary 639990 (Nov. 2014.)

ear than the right ear. (*Id.* at 62–63.) Nurse Gamble noted full range of motion in the neck, but she also documented neck stiffness, and Plaintiff had pain and pressure on the upper right neck when he looked down or to the side, and he could not rotate his neck with ease. (*Id.* at 63, 65; Doc. 73 ¶¶ 21–22.) Nurse Gamble noted that Plaintiff could squat and rise without difficulty, and his gait was steady. (Doc. 65 at 62.) Plaintiff complained that he had not received a concussion exam, and Nurse Gamble conducted a concussion exam at the encounter. (Doc. 73 ¶ 22.) He also asked that she look at his ears with an otoscope, but her otoscope was not working properly so she planned to schedule another appointment for an ear exam with an otoscope. (*Id.*; Doc. 65 at 66.)

The next day, Nurse Gamble used an otoscope to look at Plaintiff's right ear. (Doc. 65 at 56; Doc. 73 ¶ 23.) Plaintiff reported that he still had ringing in his ear. (Doc. 65 at 56.) Nurse Gamble noted that there were no signs of drainage or infection, the tympanic membrane was normal, and Plaintiff was alert with a steady and balanced gait. (*Id.*)

On April 21, 2017, Plaintiff saw NP Ende for complaints of ringing in the right ear and neck stiffness since the assault. (*Id.* at 51; Doc. 65 ¶ 25.) Ende noted some increased pressure on the right ear drum, a symptom that can be associated with pressure changes or cold or allergies. (Doc. 65 ¶ 25.) Ende prescribed Sudafed to relieve the pressure and Naproxen for the neck pain. (*Id.*)

On May 7, 2017, Plaintiff submitted an HNR stating that the Sudafed prescribed to address the ringing in his right ear had not worked and requesting an alternative treatment. (Doc. 65 at 135.)

On May 8, 2017, Plaintiff saw Nurse Gamble. (*Id.* at 42.) He reported ringing in his ears and that Sudafed did not help. (*Id.*) Plaintiff stated that the pain from the lacerations in his ear had subsided, and that he got occasional neck cramps. (*Id.*; Doc. 73 ¶ 26.) Plaintiff also told Nurse Gamble that he had headaches and cranial pressure from his right upper neck to his right eye. (Doc. 73 ¶ 26.) Nurse Gamble used an otoscope to look into each ear and noted that Plaintiff could hear commands in his right ear, and she

documented that his intraocular eye movements were within normal limits. (Doc. 65 at 43.)

On May 17, 2017, Plaintiff was seen by NP Ende in the chronic care clinic for his diagnosed Hepatitis C and HIV. (*Id.* at 34.) Plaintiff reported ringing in his ear since the assault. (*Id.*) Plaintiff also told NP Ende that he had neck problems and headaches along with the ringing in the ear, and that he had pressure building up and going from the upper right side of his neck to his right eye. (Doc. 73 ¶ 27; Doc. 72 at 9.) NP Ende noted that a trial of Sudafed made no difference, and he continued the Naproxen and Zonisamide for pain. (Doc. 65 at 34; Doc. 65 ¶ 27.)[11]

On September 1, 2017, Plaintiff submitted an HNR complaining of neck pain that was sometimes stabbing pain, constant ringing ears, and frequent headaches. (Doc. 65 ¶ 28; Doc. 73 ¶ 28; Doc. 65 at 134.) On September 13, 2017, Plaintiff saw NP Nancy Smith, who noted Plaintiff's complaints and documented a plan to start Cymbalta and Meloxicam, with the new therapeutics to be assessed on a return visit. (Doc. 65 ¶ 29; Doc. 73 ¶ 29.)[12] Thereafter, on September 29, 2017, NP Smith discontinued Cymbalta and put Plaintiff back on Zonisamide for pain, per Plaintiff's request. (Doc. 65 ¶ 30; Doc. 73 ¶ 30.)

On November 3, 2017, Plaintiff was seen by NP Nancy Chudoff in the chronic care clinic for his Hepatitis C and HIV. (Doc. 65 at 12.) Plaintiff had prepared a list of health topics to discuss, and he attempted to bring up his ear and neck problems with NP Chudoff,

---

[11] Zonisamide is an anticonvulsant that is used in combination with other medications to treat certain types of seizures. *See U.S. Nat'l Library of Med., Zonisamide*, https://medlineplus.gov/druginfo/meds/a603008.html (last visited May 24, 2019).

[12] Cymbalta, a brand name for Duloxetine, is included in the class of drugs called selective serotonin/norepinephrine reuptake inhibitors. This class of drugs is used to treat depression, anxiety, and other mood disorders. *See U.S. Food & Drug Administration*, *Duloxetine (marketed as Cymbalta) Information*, https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/duloxetine-marketed-cymbalta-informa-tion (last visited May 24, 2019). Meloxicam is a nonsteroidal anti-inflammatory drug used to relieve pain and swelling caused by osteoarthritis and rheumatoid arthritis. *See U.S. Nat'l Library of Med., Meloxicam*, https://medlineplus.gov/druginfo/meds/ a601242.html (last visited May 24, 2019).

but she refused to address them and sent Plaintiff out of her office.  (Doc. 72 at 10; Doc. 73 ¶ 31.)  NP Chudoff told Plaintiff he must submit a separate HNR for those issues.  (*Id.*)

On January 18, 2018, Plaintiff saw NP Ende, and Ende agreed to place Plaintiff back on Naproxen because Meloxicam was not helping with his neck pain or headaches.  (Doc. 72 at 10–11; Doc. 73 ¶ 32.)

On April 26, 2018, NP Ende ordered an x-ray of Plaintiff's cervical spine due to pain on the right side of Plaintiff's neck since the assault.  (Doc. 65 at 118.)  On May 1, 2018, the x-rays were performed.  (*Id.*)  The x-ray results showed normal alignment of the vertebral bodies, well-maintained disc spaces, and a normal examination.  (*Id.* at 119.)

On August 1, 2018, Plaintiff saw NP Ende in the chronic care clinic for Hepatitis C and HIV.  (Doc. 73 at 96.)  Plaintiff and NP Ende discussed his headaches and neck pain at length.  (*Id.*; Doc. 73 ¶ 34.)  NP Ende reviewed the records and showed Plaintiff on the computer in the exam room that at least three providers had submitted off-site consult requests for treatment, but all requests were denied by Corizon, including consult requests for physical therapy for the neck and for tinnitus; for an ear, nose, and throat (ENT) specialist; and for a pain management clinic.  (Doc. 72 at 11; Doc. 73 ¶ 34.)  NP Ende concluded that one option to treat Plaintiff's neck pain was to place him on Tramadol.  (*Id.*)  Plaintiff's medical records show that he was started on Tramadol on August 9, 2018.  (Doc. 73 at 108.)

### C.    Legal Standard

To support a medical care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs."  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard.  First, a prisoner must show a "serious medical need."  *Id.* (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX*

*Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 1059–60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'" *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)). Deliberate indifference may also be shown where prison officials fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt*, 865 F.2d at 200).

Even if deliberate indifference is shown, to support an Eighth Amendment claim the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep' t*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

**D.  Discussion**

**1.  Serious Medical Need**

Corizon Defendants argue that lingering neck and head pain and tinnitus do not constitute objectively serious medical needs. (Doc. 64 at 9.) They assert that tinnitus rarely indicates a serious health problem and is considered an annoyance. (*Id.*) They acknowledge that people with tinnitus also have some degree of hearing loss, but they claim that this does not indicate a serious medical problem. (*Id.*) Corizon Defendants argue that Plaintiff has not shown that his reported tinnitus interferes with his daily activities or causes

him unnecessary pain and suffering. (*Id.* at 10.) As to Plaintiff's neck pain, Corizon Defendants maintain that the Plaintiff's complaints of pain have been sporadic, and he has not submitted any HNRs regarding neck pain since September 2017. (*Id.*)

The Court takes as true Plaintiff's allegations that he immediately reported concussion symptoms to Nurse Gamble and Dr. Elijah following the assault, and that he repeatedly complained of neck pain in multiple HNRs and in person at virtually every medical appointment thereafter—including his chronic care appointments. (Doc. 72 at 15–16; Doc. 73 ¶ 35.) Notably, Plaintiff raised and discussed his neck pain with NP Ende at the August 1, 2018 appointment, approximately one month before Corizon Defendants filed their Motion for Summary Judgment. (Doc. 73 ¶ 34.) Plaintiff explained that he quit filing HNR forms because he was charged a $4.00 co-pay each time he saw a nurse in response to an HNR, and the nurses all gave him the same response. (Doc. 72 at 16.) Another reason Plaintiff stopped filing HNR forms was due to concern over punitive action in response to filing more HNRs raising the exact same issue, for which prisoners can be charged with harassment, false reporting, obstructing staff, and malingering. (Doc. 73 ¶ 35.) In their Reply, Corizon Defendants did not refute that prisoners can face discipline for filing multiple HNR forms regarding the same issue. (*See* Doc. 79.) On this record, Plaintiff has continued to complain of neck pain since the assault, and his failure to continue to file HNRs regarding the same complaint does not undermine his claim that the pain is serious and affects his daily life.

Courts are divided as to whether tinnitus constitutes a serious medical need. *Compare Cooper v. Johnson*, 353 F. App'x 965, 966, 968 (5th Cir. Dec. 1, 2009) (addressing whether the individual defendants were deliberately indifferent to the prisoner's serious medical needs, which included several ear infections and tinnitus that developed after surgery on the prisoner's left ear); *Houser v. Folino*, No. 10-0416, 2014 WL 3696130, at *16 (W.D. Penn. July 23, 2014) (tinnitus is a serious medical need), *with McDowell v. Talbot*, No. 11-cv-2230, 2012 WL 6004220, at *4 (C.D. Ill. Nov. 30, 2012) (finding that "garden-variety" tinnitus, without more, is unlikely to constitute a sufficiently

serious medical need under the Eighth Amendment); *Davidson v. Scully*, 155 F. Supp. 2d 77, 85 (S.D. N.Y. 2001) (finding that tinnitus was not a serious medical need because it does not cause pain). Here, in light of Plaintiff's complaints that the ringing in his ears was constant, and because the evidence shows that medical staff found his complaints of tinnitus worthy of documentation and treatment, including outside consult requests for an ENT, a reasonable jury could find that Plaintiff's condition constituted a serious medical need. *See McGuckin*, 974 F.2d at 1059–60.

## 2. Deliberate Indifference

The Court turns to the second prong, which requires Plaintiff first to show that each Defendant was "subjectively aware of the serious medical need[.]" *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017–18 (9th Cir. 2010) (quotation and citation omitted). A defendant's knowledge of a serious medical need or substantial risk to health "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence," and a defendant may be found to have known of a substantial risk if the risk was obvious. *Farmer*, 511 U.S. at 842. Plaintiff must then show, as to each individual Defendant: (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need; and (b) harm caused by the indifference. *Jett*, 439 F.3d at 1096.

### a. Dr. Young

In their Motion for Summary Judgment, Corizon Defendants do not present any argument that Dr. Young was not subjectively aware of Plaintiff's serious medical need. (*See* Doc. 64.)[13] Indeed, the April 9, 2017 medical record documents that, upon examining Plaintiff after the assault, Nurse Gamble contacted NP Ende, and then NP Ende called Dr. Young. (Doc. 65 at 91.) Moreover, in their Motion, Corizon Defendants assert that

---

[13] In their Reply, Corizon Defendants argue for the first time that Plaintiff cannot show that Dr. Young was subjectively aware of an excessive risk to Plaintiff's health. (Doc. 79 at 5–7.) The Court does not consider this argument. *See Padgett v. Wright*, 587 F.3d 983, 985 n.2 (9th Cir. 2009) (per curiam) (the court will not consider arguments raised for the first time in the reply brief); *United States v. Anderson*, 472 F.3d 662, 668 (9th Cir. 2006) (recognizing the general principle that arguments raised for the first time in a reply brief are waived).

"[b]ased on the facts relayed to NP Ende and Dr. Young, Dr. Young ultimately elected to have Dr. Elijah assess Plaintiff in the morning and determine whether stitches could be performed on site." (*Id.* at 11.)[14] From these facts, the inference can be made that Nurse Gamble informed Dr. Young of Plaintiff's injury and symptoms as she documented them in the medical record. Specifically, she documented that Plaintiff reported he had been attacked from behind and hit in the ear and he had two lacerations in the ear, one approximately 2 cm in length and the other approximately 1 cm in length. (Doc. 65 at 85–86.) Nurse Gamble noted bleeding that was controlled with pressure, and that Plaintiff had approximately 5 cc of blood on the side of his face and in his ear. (*Id.* at 86.) The medical record also documents that a practitioner was contacted due to "abnormal vital signs" and "lacerations needing stitches." (*Id.* at 91.) From this information, a reasonable jury could conclude that Dr. Young was aware of Plaintiff's serious medical need.

After showing that a defendant was subjectively aware of a serious medical need, a plaintiff must show that the defendant "failed to adequately respond" to that need. *Simmons*, 609 F.3d at 1018. A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) ("access to medical staff is meaningless unless that staff is competent and can render competent care"); *see Estelle*, 429 U.S. at 105 & n.10 (the treatment received by a prisoner can be so bad that the treatment itself manifests deliberate indifference).

---

[14] With their Reply, Corizon Defendants submit Dr. Young's declaration, in which he states that he does not recall receiving a telephone call on the day of the assault, he does not recall what he may or may not have been told regarding Plaintiff's medical presentation, and he is unaware of what advice he may or may not have given about Mr. Cook. (Doc. 79, Ex. A, Young Decl. ¶¶ 5, 9.) Failure to remember factual information, like having a "belief" in factual information, is insufficient because it does not show personal knowledge. *See* Fed. R. Civ. P. 56(c)(4) (sworn statement used to support summary judgment motion must be made on personal knowledge); *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412–13 (9th Cir. 1995) (declaration on information and belief are entitled to no weight where declarant lacks personal knowledge). The Court therefore does not consider Dr. Young's statements. Further, the medical records document that NP Ende called Dr. Young regarding Plaintiff's treatment following the assault. (Doc. 65 at 91.)

The record shows, and Corizon Defendants confirmed in their Motion, that after being informed of Plaintiff's condition, Dr. Young elected not to send Plaintiff to the emergency room and advised that Dr. Elijah would assess Plaintiff the next morning to determine if stitches could be done onsite. (*Id.* at 90–91.) Corizon Defendants nonetheless argue that the decision whether to send Plaintiff to the emergency room was not up to Dr. Young; rather, it was NP Ende's decision. (Doc. 79 at 5–6.) In his declaration, Dr. Young avers that, regardless of the advice he gave about Plaintiff, it is the on-call provider—in this case, NP Ende—who has the discretion to send a patient to the emergency room if it is determined that emergent care is warranted. (Doc. 79, Ex. A, Young Decl. ¶ 9.) There is no dispute that Dr. Young was NP Ende's superior, and Dr. Young is a physician, whereas NP Ende is not. In these circumstances, Dr. Young's decision, or his ratification of NP Ende's treatment decision, if that was the case, are sufficient to support Dr. Young's liability. *See Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011) (to be liable, "the supervisor need not be directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury"); *Peschel v. City of Missoula*, 686 F. Supp. 2d 1092, 1102 (D. Mont. 2008) (a supervisor's ratification of another's conduct can form the basis for liability if the ratification decision approves both the subordinate's decision and the basis for it and the ratification decision is the product of a conscious choice to ratify the conduct) (citations and quotation omitted).

Dr. Young explains that the most important consideration when making the determination whether to send a prisoner out for emergent medical care following a potential head injury is whether the prisoner lost consciousness. (Doc. 79, Ex. A, Young Decl. ¶ 10.) Other considerations include whether the prisoner shows mental status changes, loss of balance or coordination, or memory loss. (*Id.* at ¶ 11.) Nurse Gamble's April 9, 2017 medical notes do not document whether Plaintiff lost consciousness or whether Plaintiff was asked if he lost consciousness. (*See* Doc. 65 at 85–91.)[15] Nor do

---

[15] In their Statement of Facts, Corizon Defendants assert that Nurse Gamble "noted Plaintiff was able to hear out of both ears, appeared calm and denied loss of consciousness,"

Nurse Gamble's medical notes address Plaintiff's coordination, mental status, or memory. (*See id.*) On this record, there is no evidence that Dr. Young considered or inquired into whether Plaintiff lost consciousness, and there is no evidence he considered the other relevant factors before he made the decision not to send Plaintiff to the emergency room.

Plaintiff alleges, and Corizon Defendants do not refute, that despite his reports of seeing a flash and squiggly lines, and ringing in his ears, no concussion check or protocol was performed until a week after the incident. (Doc. 73 ¶ 21.) Dr. Young explains that symptoms of concussion include headaches, dizziness, and ringing in the ears, among other things. (Doc. 79, Ex. A, Young Decl. ¶ 14.) Standard treatment for a concussion is bed rest and monitoring for 48–72 hours for any changes in mental status. (*Id.* ¶ 13.) As stated, Nurse Gamble's notes documented that Plaintiff was hit in the side of head hard enough to cause two lacerations in the ear that needed stitches and that he had abnormal vital signs. (Doc. 65 at 85–86, 91.) There is no evidence that, even with this information, Dr. Young inquired into whether there were signs of a concussion or advised Nurse Gamble to conduct any type of concussion check.

The facts indicate that Dr. Young's only involvement in Plaintiff's medical care was his April 9, 2017 advice to Nurse Gamble not to send Plaintiff to the emergency room and his failure to order any type of concussion protocol. Generally, for an isolated incident to rise to deliberate indifference, it must be egregious in nature. *See McGuckin*, 974 F.2d at 1060–61 (repeated failure to properly treat a prisoner or a single failure that is egregious strongly suggests deliberate indifference); *Wood*, 900 F.2d at 1334 ("[i]n determining deliberate indifference, we scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect"). However, "the more serious the medical needs of the prisoner, and the more unwarranted the defendant's action in light of those needs, the more likely it

and they cite to the April 9, 2017 medical record for support. (Doc. 65 6.) But there is no note that Plaintiff denied loss of consciousness, nor any mention of whether there was a loss of consciousness anywhere in the medical record. (Doc. 65 at 85–91.) Thus, Corizon Defendants' asserted fact is not supported by the cited material. *See* Fed. R. Civ. P. 56(c)(1)(A).

is that a plaintiff has established 'deliberate indifference' on the part of the defendant." *McGuckin*, 974 F.2d at 1061. Thus, if Plaintiff had suffered serious complications or fallen into a coma following Dr. Young's decision not to send him to the emergency room, a jury could find that Dr. Young's failure to ascertain pertinent information regarding Plaintiff's condition and his summary decision as to the course of care amounted to deliberate indifference. *See Rasmussen v. Skagit Cnty.*, 448 F. Supp. 2d 1203, 1207–08, 1211–12 (W.D. Wash. 2006) (even though the defendant doctor saw jail detainee just once before she died from sepsis due to Staphylococcus aureus pneumonia, the district court found that because detainee was dead within mere days of the onset of symptoms, the fact that the defendant doctor "could not have stretched his allegedly deliberately indifferent provision of medical care over many months should not now preclude Plaintiffs' § 1983 claim"). But the record shows that there was no such medical emergency, and, at most, Plaintiff exhibited signs of a concussion following the assault, but the lack of monitoring in the 48–72 hours following the incident did not harm Plaintiff. Indeed, on April 10, 2017, after suturing Plaintiff's ear, Dr. Elijah ordered three days of bed rest with meals—a standard treatment for concussions. (Doc. 65 at 81.) On this record, the facts do not evidence an egregious failure on Dr. Young's part, and they do not support deliberate indifference. Accordingly, summary judgment will be granted to Dr. Young.

### b. Dr. Elijah

Corizon Defendants argue that there were no facts from which Dr. Elijah could infer that there existed a substantial risk of serious harm to Plaintiff's health where the evidence shows that, on April 10, 2017, Dr. Elijah examined him and found that his vital signs were stable; he was in no acute distress; he was alert to person, place, and time; and he denied that he had lost consciousness. (Doc. 64 at 11; Doc. 65 ¶¶ 12, 14.) Taking Plaintiff's facts as true, however, Plaintiff was in distress, as his pain level was 8/10. (Doc. 73 ¶ 12.) Moreover, Dr. Elijah was informed by Plaintiff that he has seen a flash when he was hit, and he experienced squiggly lines in his vision, dizziness, nausea, and vomiting. (*Id.*; Doc. 72 at 6.) Plaintiff also reported neck pain and ringing in his ear. (Doc. 72 at 6.) When

considering Plaintiff's pain level and symptoms, a reasonable jury could find that Dr. Elijah was aware of a serious medical need.

With respect to Dr. Elijah's response, Corizon Defendants assert that she sutured Plaintiff's ear and addressed Plaintiff's reported pain by prescribing a stronger pain medication, evidencing a reasonable response to Plaintiff's medical needs. (Doc. 64 at 11; Doc. 79 at 10.) But according to Plaintiff, Dr. Elijah refused Plaintiff's requests to conduct any type of ear exam or concussion protocol because she was too busy. (*Id.*)

Dr. Elijah's failure to document all of Plaintiff's symptoms or to conduct a more thorough exam to check Plaintiff's inner ear and potential concussion status may exhibit negligence. As with Dr. Young, however, Dr. Elijah's conduct during this single encounter was not so egregious to rise to the level of deliberate indifference. As stated, Dr. Elijah ordered three days of bed rest, which is treatment for a concussion. (Doc. 65 at 81.) And while Plaintiff continued to suffer headaches, neck pain, and ringing in the ears, the facts show that he was seen numerous times by NP Ende, who attempted various treatments. Consequently, Plaintiff cannot show that he was harmed by Dr. Elijah's failure to provide more thorough treatment and testing at the April 10, 2017 appointment. For these reasons, summary judgment will be granted to Dr Elijah.

### c. NP Ende

Although Corizon Defendants dispute it, Plaintiff asserts that he has continued to suffer from and to report ongoing neck pain, headaches, and ringing in his ears. (*See* Doc. 72 ¶¶ 26–27, 31, 32–34.) And Plaintiff specifically alleges that he discussed his symptoms and pain with NP Ende and sought relief. (*Id.*) At the least, there is a question of fact whether NP Ende was aware of Plaintiff's serious medical need.

As to NP Ende's response, Plaintiff acknowledges that NP Ende responded to his complaints and pain and attempted various treatments. The medical records show that NP Ende ordered an x-ray of Plaintiff's neck, and Plaintiff's own facts show that NP Ende conducted proper ear exams with an otoscope; prescribed Sudafed to try to drain fluid and reduce pressure in the ear; prescribed and adjusted pain medications based on

effectiveness; and submitted outside consult requests for physical therapy, an ENT specialist, and a pain management clinic. (Doc. 65 at 118; Doc. 72 at 8–11; Doc. 73 32–34.) Although the outside consult requests were all denied, those denials were by Corizon directors and administrators, not by Ende. Plaintiff did not name Corizon as a defendant, and NP Ende cannot be liable for a Corizon policy or practice of denying treating providers' requests for outside consults and treatment. In short, the record supports that NP Ende took steps in an attempt to improve Plaintiff's situation; therefore, his actions do not exhibit deliberate indifference. S

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to the Motions for Summary Judgment (Docs. 64, 66).

(2)     Corizon Defendants' Motion for Summary Judgment (Doc. 64) is **granted**; Count Two is dismissed with prejudice.

(3)     Dr. Young, Dr. Elijah, and NP Ende are dismissed as Defendants.[16]

(4)     ADC Defendants' Motion for Summary Judgment (Doc. 66) is **denied**.

(5)     The remaining claim is the Eighth Amendment failure-to-protect claims in Count One against Lee, Kaufman, Metzler, Charette, and Pontious.

(6)     This action is referred to Magistrate Judge John Z. Boyle to conduct a settlement conference.

(7)     Defense counsel shall arrange for the relevant parties to jointly call Magistrate Judge Boyle's chambers at (602) 322-7670 no later than **July 3, 2019** to schedule a date for the settlement conference.

Dated this 19th day of June, 2019.

David G. Campbell
Senior United States District Judge

---

[16] Dr. Elijah is listed on the docket as "Unknown Party, named as Ms. Elisha, Doctor." Defendants confirmed that this refers to Dr. Itoro Elijah. (Doc. 9.)